## Case No. 11,246.

POLAND et al. v. The SPARTAN.

[1 Ware (134) 130.] [1]

District Court, D. Maine. July 1, 1828.

SEAMEN'S WAGES — LIEN ON FREIGHT — STATUTE ALLOWING PROCESS AGAINST VESSEL—LIABILITY OF CHARTERERS—INSOLVENCY—PRIORITY.

1. The seamen have a lien, by the maritime law, on the freight as well as the vessel for their wages.

[Cited in The Hendrik Hudson, Case No. 6,358; The Hyperion's Cargo, Id. 6.987; The Eolian, Id. 4.504; McCarty v. The City of New Bedford, 4 Fed. 830.]

[Cited in Story v. Russell, 157 Mass. 157, 31 N. E. 753.]

2. This lien is not taken away by the statute of the United States for the government of seamen in the merchant service (volume 2, c. 56, § 6,) which allows process against the vessel.

3. When a ship is taken by a charter party, by the terms of which the charterers are to bear the expense of victualling and manning, and they become the owners for the voyage, the seamen have a lien for their wages on the cargo shipped on the account of the charterers, for a charge in the nature of freight.

[Cited in Smith v. The Creole, Case No. 13,-032; The Hendrik Hudson, Id. 6,358.]

4. The charterers having become insolvent, and assigned their property in trust to pay their creditors, among whom the seamen were named, it was ruled that their wages were a privileged claim against the cargo, which was to be preferred to the title of the assignees under the assignment, and to that gained by the attaching creditors, and that they are not bound to wait to receive their wages in the order fixed by the assignment.

[Cited in note in Francis v. The Harrison, Case No. 5,038. Cited in The Sailor Prince,

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

Id. 12.218: Maxwell v. The Powell, Id. 9,-324; The Isabella, Id. 7.100; Taylor v. Carryl, 20 How. (61 U. S.) 605.]

5. When property is taken for security in the admiralty by a warrant of attachment, the attachment may be dissolved and the property restored to the claimant on his filing a stipulation, with sureties, according to the form used by the court.

[Cited in Wall v. The Royal Saxon, Case No. 17.093.]

[Cited in Keating v. Spink, 3 Ohio St. 122.]

[This was a libel by James Poland and others, against the freight and cargo of The Spartan (Jacob Quincy, Charles Fox, Joseph E. Foxcraft, and Robert H. Thayer, claimants).]

The facts upon which this case turns, lie in a narrow compass, and are not controverted. William J. and Charles E. Quincy chartered the brig Spartan of Zadock Prince and others, owners, for a voyage from Portland to the Western Islands, and back to Portland. The charterers, by the terms of the charter party, were to victual and man the ship, and bear all other charges, and pay for the hire of the vessel at the rate of one dollar per ton, by the month, in thirty days after the termination of the voyage. The crew were shipped by the charterers, who had the entire use and control of the vessel. She sailed on the 20th of September, 1827, performed her voyage successfully, and returned to Portland on the 25th of April last, with a cargo of 3,800 quintals of barilla, and a few other articles belonging to the charterers. Of the barilla, 1,616 quintals were shipped by Mr. Thayer, on freight, and consigned to himself, and 2,290 were shipped on account of the Messrs. Quincys. While the vessel was absent on her voyage, the charterers having become embarrassed in their business, made an assignment of all their property, including the return cargo of their vessel, to Jacob Quincy and Charles Fox, in trust, to pay their creditors in a certain specified order of preference. As soon as the brig arrived, the cargo was also attached by sundry of the creditors of the charterers. No provision was made for the payment of the wages of the seamen, except in the order in which they stood on the schedule of creditors attached to the deed of assignment. On this, the claims of several creditors to whom the charterers were indebted to a large amount, were preferred to that of the seamen. To secure their wages they filed their libel, in which they claim to be paid out of the freight earned in the voyage, in the hands of the captain, and also for process against that part of the cargo which is owned by the charterers, that it may be holden to respond to them for the amount due for wages. Several conflicting claims were interposed for the property, the merits of which are not involved in this case. No freight has been paid to the master by Mr. Thayer, but he has come in under the general monition, as a claimant, and filed a stipulation for the amount of freight due on his shipment. The master, in his answer, admits the wages of the seamen to be due, and submits the case to the decision of the court; but their right to proceed against the freight is resisted by the assignees, and by the sheriff in behalf of the attaching creditors.

Messrs. Greenleaf and Shepley, for libellants.

Mr. Longfellow, for assignees.

Fessenden & Deblois, for sheriff and attaching creditors.

C. S. Daveis, for Mr. Thayer.

WARE, District Judge. This is a case, novel in its form, and important in the principles which it involves; and it has very naturally excited considerable interest among mercantile men for the direct bearing it has on the great shipping interests of the country. It has been argued with eminent ability on both sides, and it is but an act of justice on my part to acknowledge my obligations to the learned counsel, for the pleasure as well as the assistance which I have received in coming to a result, from the very elaborate discussion of the questions which arise in the case. In my examination, I have attentively read all the cases and authorities cited at the bar, and have referred to some others having a bearing on the questions in litigation which I have met with in my own researches.

This is a suit for mariners' wages, a subject familiar to the jurisdiction of the admiralty, but as far as my information extends, and as far as I have been informed by the learned arguments at the bar, entirely novel in its form. The case is admitted to be of the first impression, and, without any judicial decisions for our guide, the court is left to thread its way through, with no landmarks to direct its steps but the general and leading principles of maritime jurisprudence. I have given to the subject the best consideration that is within my ability and means of information, and if I have been led to a wrong conclusion by false lights, it is a source of no little consolation to me that my errors can be corrected by a court to which the parties may appeal, with a perfect assurance that their rights will be thoroughly investigated in the final decision of the case.

The libel proceeds against the freight and cargo of the vessel for the wages of the mariners; that is, against the freight of so much as was taken on freight, and against that part of the cargo which the charterers shipped on their own account. It goes on the principle of a double maritime hypothecation; first, that the cargo is hypothecated for the freight, and secondly, that the freight is hypothecated for the wages. Both those principles are maintained by the counsel for the libellants, and it is further contended that the freight may be reached by the seamen, at least so much as is necessary to pay their wages, by a direct libel on the merchandise. Indeed,

the argument went the length of asserting a direct lien on the cargo, for the full amount of wages; but however strong the language of the old maritime law may be, it may be doubted whether the lien, if it ever existed to the extent contended for, must not now be considered as limited to the amount of freight due upon it.

That the master has a lien on the cargo for his freight is a familiar principle of maritime law, not controverted by the respondents. It has been settled in numerous cases, and is laid down as a principle, not to be called in question, in all the elementary treatises. But while this is fully conceded, it was contended, in argument, that this is a mere naked authority to retain the goods for the purpose of compelling payment; and if the merchant chooses to suffer his goods to remain or perish in the master's hands, that the law furnishes no process, that it confers on the master no right of proceeding judicially against the cargo, to convert so much of it into money as will pay the freight. I have had occasion to examine this point in another libel against this cargo, and for the present I merely observe that in this libel, if the rights of the libellants are as they are contended to be by their counsel, I feel free to give them the remedy which they seek. If their lien extends to the merchandise, my opinion is, that this is the proper court to enforce it, and that they have elected the proper process by which to pursue their remedy. If it be admitted that the cargo is hypothecated for the freight, the next inquiry is, in what relation do the seamen stand to the freight.

Freight is the hire which is earned by the transportation of goods. This is the original and elementary signification of the word. It is due for the service which is rendered in transporting them from a place where they are supposed to be worth less, to a place where they are worth more. This service has given to the merchandise a new value, which it had not before; as much so as is given by a tailor to a piece of cloth which he has made into a coat, or by any other mechanic, when he has, in the way of his trade, changed the form of a thing, and converted it into what is technically called, in the civil law, a new species. Though here has been no change in the form of the thing, yet there has been a service performed, by which it has received a new and additional value, as certain and as distinguishable from its former value, as that which is given by a mechanic who converts one species into another. It is a general principle of law, extending to a great variety of cases, that a person who has, by his own labor, thus added a new value to a specific article, has a lien on the article for the value of his service. It is a right consonant to all ideas of natural equity, and is highly favored by the law. 2 Kent, Comm. 496. The mechanic is considered as gaining a qualified property in the article, when he

has incorporated into it his own skill, care, and labor. Another general principle is, that when this sort of confusion of goods is produced at the request of the general owner, he that has given the last increment of value to the article, is entitled to be first satisfied out of the common stock. In the nature and reason of the thing there is no difference. in this respect, between the mechanic and the carrier. In the case of marine transportation, by whom has this service been performed? The answer obviously is, by the vessel and crew jointly. Neither has an exclusive agency, but their service is concurrent. In the common sense and equity of the case, the crew and the vessel have a joint or partnership interest in the freight, and independent of positive regulation, special contract, or a usage that has the force of law, no distinction can be made between the title of the crew to the freight, and that of the vessel or her owners. It is in its own nature as perfectly a joint or partnership interest as can be conceived. The opinions now expressed are not new. If there be no adjudicated case directly in point, they are at least supported by the dicta of learned jurists, and are in harmony with the general analogies of the law. The freight is steadily looked to as the proper fund out of which wages are to be paid. "In all cases," says Holt, Shipp. 275, "the question of wages turns upon the same principles, whether the ship has earned her freight or not." In a very late case, Lord Chief Justice Abbot, in very decisive terms, lays it down as a fixed rule of the law of England, that where no freight is earned no wages are due. "A seaman's wages," he says, "can only be recovered out of a certain fund, namely, the freight earned in the voyage." Brown v. Moates, Holt, Shipp. p. 276. The generality of this language must be received with several exceptions. But it serves to show how uniformly the eyes of English jurists are fixed on the freight as being, in the expressive language of the law, the mother of wages. Judge Winchester, in the case referred to in the argument, expressly says that "the contract of the sailors is a species of copartnership between them and the owners. If all is lost, the sailors lose their wages; but if all is not lost, that which remains of the ship and freight is a common property, pledged for the payment of wages. Freight gained and put on shore, is saved from a subsequent shipwreck. It goes into the common stock. but, like the savings from a wreck, is to the last nail or cable hypothecated to the wages. Freight is a trust fund in the hands of the owners, to be accounted for to those whose industry produced it." Relf v. The Maria [Case No. 11,692]. The lien of the seamen for their wages is expressed here in terms as strong as language can furnish. Emerigon, Traité des Contrats a la Grosse, tome 2, c. 17, sect. 11, § 2, and also 2 Boulay-Paty, Cours de Droit Com. Maritime, 223.

If the English' books contain no adjudicated case directly in point, a satisfactory reason may be given for it. The common law courts prohibit the only court in which the lien can be enforced, from taking jurisdiction of the case. But the language of foreign writers on maritime law is clear and unequivocal. By the Marine Ordinance of Louis XIV. liv. 3. tit. 4, art. 19, the ship and freight are specifically pledged for the payment of the mariners' wages; and the principle is re-enacted in the Code de Commerce, § 271, in the same words. Valin, in his Commentary, says that if the freight has been paid to the master, and he applies it to the payment of his private debts, there will remain to the seamen only their personal action against the master; they can neither recover it against the merchant, nor against the captain's creditors, unless there has been fraud. They ought, he adds, to have taken the precaution to seize the freight in the hands of the merchant. 1 Valin, 751. Boucher, a late writer of respectable character, on maritime law, quotes and approves the decision of Valin. But he takes a distinction. If the captain receives his freight in part of the merchandise, and this is transferred by him in payment of a pre-existing debt, the seamen, he holds, can reclaim it in the hands of his creditors. His words are, "The freight being pledged for the payment of the wages of the sailors, they have the quality of proprietors to the amount due to them; and they may consequently reclaim them in the hands of the captain's creditors." Boucher, Droit Maritime, pt. 3, § 7, pars. 1159, 60–61. The reason of the distinction is, that the pieces of money paid cannot be identified, a reason purely technical; but he expressly affirms that the hypothecation gives to the sailors a proprietary interest in the freight. The marine law also of Spain and Portugal renders the freight as well as the vessel answerable for the wages of the seamen. Jac. Sea Laws, 150. Roccus affirms the general principle in the strongest terms, and overrules the distinction set up by Boucher. "Mariners," he says, "for their freights and wages, have an implied hypothecation, with right of preference, on all goods laden on board; by which right of preference, the sailors may recover money previously paid to other creditors." Ingersoll's Roccus, note 91. This action he affirms to be always open to the mariners, and he refers to a case decided in Portugal, and reported by Pierera de Castro. The same decision is cited by Valin, and denied to be good law in the extent to which it goes. 1 Valin, 752. The words of Cleirac, in his Commentary on the Laws of Oleron, are quoted by Abbot as constituting at this day an established principle in the maritime law, but as ineffective in England only because the court of admiralty, by which alone it can be made operative, is denied jurisdiction over the case. Law of Shipp. (Am. Ed.) 135, 136. "By custom," says Cleirac, "the ship is bound to the mer-

chandise, and the merchandise to the ship." Us et Coutumes de la Mer, p. 72. By turning to page 503 of Les Us et Coutumes de la Mer, Navigation des Rivieres, articles 18, 19, we shall find Cleirac himself explaining what is meant by this maxim of the marine law. "The vessel," says he, using the same terms, "is bound to the merchandise and the merchandise to the vessel; that is to say, if the merchant fails in the time of payment and causes delay, the master or mariners are privileged to cause the goods which they have carried to be seized, and to be sold to the amount that is due them." He then states the reciprocal right of the merchant to hold the vessel to respond for any injury to the merchandise, occasioned by the fault of the master or mariners. It may be said that this relates only to river navigation, and stands on the ground of a positive ordinance. I refer to it only as a definition of the words used in another part of his work, where they are applied wholly to maritime navigation. Again, in the Jurisdiction de la Marine, p. 351, he is treating of maritime navigation, and says that the "wages of the mariners are to be preferred in a decree against the ship and merchandise, and over all other debts, so that, should there remain but so much of the ship and merchandise, even to the last nail, they shall have it." It appears from Voet that by the law of Holland the seamen have a lien on the cargo as well as the ship, for their wages in foreign voyages, and he quotes Grotius as affirming this right as a general principle of maritime law. Voet ad Pandectas, L. 20, tit. 2, § 30.

I do not find that the Consulate of the Sea, in express terms states that the freight is pledged for the wages of the mariners, but if we do not find the principle anywhere plainly expressed, in many parts of this venerable ordinance we find its rudiments recognized. It is said that the master is bound to pay the mariners with the freight that he receives. Consulat de la Mer, Boucher's trans. He is holden to pay the mariners immediately on receiving the freight, and in the same money that he receives of the merchants. Chapter 138. If the merchant, after the goods are laden, declines to send them, he is held to pay half freight, and in this case the sailors shall receive half their wages. Chapters 83, 84. All these provisions seem to import an interest of the seamen in the freight. It is also provided that no caution or security can be given for the freight, though in every other case the consuls who have, by that ordinance, jurisdiction over maritime affairs, are authorized to order security to be taken. Chapters 42, 196. The translator, in a note, observes that freight is singularly favored in this ordinance, because it is pledged for the payment of wages. These authorities go the full length of affirming it as a general principle of maritime law, that the seamen have a direct hypothecatory interest in the freight, for the amount of their wages.

Their lien on the freight is described in the same terms as their lien on the vessel; that this lien can be enforced by seizing the freight in the hands of the merchant, before it is paid over to the master; that if the merchants refuse payment, they can proceed against the merchandise, and compel a judicial sale of so much as is necessary to pay their wages. It is not distinctly stated whether they can enforce their claim for wages against the cargo to an extent beyond the amount of freight which is due upon it. But I think, upon principle, this must be the natural and necessary limitation of their privilege, where the owner of the ship and cargo are different persons; except in those cases of misfortune where a claim of salvage is mixed with a claim of wages. Taylor v. The Cato [Case No. 13,786], and Weeks v. The Catharina Maria [Id. 17,351], cited at the bar, were cases of this mixed character.

It is objected by the learned counsel for the respondents, that many of the authorities relied on at the argument, are either the positive enactments of foreign ordinances, or the dicta of foreign writers, which have not the force of law in this country. Proprio vigore it is true that they have not. But they have always been considered as high evidence of what the maritime law actually is; they are familiarly quoted in our courts of law, they are constantly referred to as of authority in our best elementary treatises, and are relied on by our highest courts of judicature, if not as express grounds of decision, at least as entitled to great respect in all cases involving the general principles of maritime law. In the very late case of The Neptune, which was a case of wages like the present, decided by Lord Stowell, in 1824, he overruled all the common law cases in which it is held that wages are dependent exclusively on the earning of freight, and professedly taking his stand on the general maritime law, and invoking, as authorities to sustain the principle, the marine law as held in France, in Spain in the height of her maritime greatness, of Holland in the period of her greatest commercial prosperity, of Denmark, and of this country, he ordered wages to be paid from the savings of a wreck, though no freight had been earned; thus at a single stroke completely revolutionizing all common law ideas on this subject, and overturning, or at least, very essentially qualifying a maxim that had stood unquestioned by the common law courts for ages. Holt, Shipp. 278.[2]

When we can trace up a principle to the very incunabula of the science, and find one uniform and concurring voice among the most respected writers of different ages and nations, and find this principle expressly and strongly asserted by one of the ablest of our own maritime judges, as the existing law of this country, it would certainly seem to be safe to rest on such authority, though no adjudicated case can be found directly in point. Such appears to me to be the authority for the principle that freight is pledged for wages, a principle which also comes so strongly recommended by the most obvious reasons of natural equity. But it is argued that, admitting the rule of the marine law to be as contended, the right of the seamen to proceed against the freight for their wages is taken away by the operation of the statute of the United States for the government and regulation of seamen in the merchant service. 2 Laws U. S. [Bior. & D.] c. 56, § 6 [1 Stat. 131]. I do not so understand the statute. It authorizes the seamen, under certain regulations, to obtain process against the vessel for the security of their wages. This merely affirms and regulates a remedy which they had before, and it would be going a great way to hold that this deprived them, by implication, of another concurrent remedy. The freight is the proper, it is the peculiar and appropriate fund out of which wages are to be paid, and the personal responsibility of the master is founded not so much on the contract, as on the fact that he

---

[2] "The marine law of the United States," says Chancellor Kent, "is the same as the marine law of Europe. It is not the law of a particular country, but the general law of nations;" and Lord Mansfield applied to its universal adoption the expressive language of Cicero, when speaking of the eternal laws of justice. "Nec erit alia lex Romæ alia Athænis; alia nunc alia posthac; sed et omnes gentes, et omni tempore una lex et sempiterna, et immortalis continebit."

"When Lord Mansfield mentioned the law of merchants as being a branch of public law, it was because that law did not rest essentially for its character and authority on the positive institutions and local customs of a particular country, but consisted of certain principles and usages which general convenience and a common sense of justice had established, to regulate the dealings among merchants and mariners, in all the commercial countries of the civilized world." 2 Kent, Comm. 509, 510.

Mr. Brougham, in his late speech on the "State of the Law," while he threatens to reform the whole municipal law of the kingdom, with an unsparing hand, and to strike out what he considers abuses, both in its principles and practice, with a boldness which, I think, must strike with dismay those who have been bred up in habits of veneration for black letter lore, and those who have been smitten with affection for the subtleties of special pleading, or are charmed with the mysteries of conveyancing, proposes to leave the commercial law as it is, and the reasons he gives for it are worth noticing. I quote them from a copy of his speech corrected and published by himself.

"I intend also to leave out of my plan the commercial law. It lies within a narrow compass, and it is far purer and freer from defects than any other part of the system. This arises from its later origin. It has grown up within two centuries, or little more, and been framed by degrees, as the exigencies of mercantile affairs require. It is accepted too, in many of its main branches, by other states, forming a code common to all trading nations, and which cannot be easily changed without their consent. Accordingly, the provisions of the French Civil Code, unsparing as they were of the old municipal law, excepted the law merchant, generally speaking, from the changes which they introduced."

is entitled to receive the freight for those to whom of right it belongs. If the seamen have not usually resorted to this fund, it is because the law supplies an easier and simpler remedy. But when a party has several remedies, it lies with him to elect that which he judges most advantageous for himself. On the whole, after the most deliberate examination I have been able to give the subject, I am brought to the conclusion that the seamen have a lien on the freight for their wages, which may be enforced by a libel in the admiralty. This applies to so much of the freight as is due on that part of the cargo which was shipped and consigned to Mr. Thayer.

With respect to the rest of the cargo, it is contended that no freight is due, except what is secured by the charter party. By the terms of that instrument, the charterers were to victual and man the ship, and to pay all charges. It is argued that being owners for the voyage, they are their own carriers, and no freight is due. If this be correct, as the charterers are insolvent and have assigned their whole property, including this cargo, the effect will be that the owners of the vessel will not only lose the whole charter of the ship, but will, through the liability of the vessel, indirectly have thrown upon them the additional burden of the seamen's wages. To my mind it appears that this part of the case turns simply on the question whether the lien of the seamen extends to the merchandise, or is confined to the hire for transportation stipulated between the ship-owners and the owners of the cargo. If the seamen can enforce their claim against the goods taken on freight, I see no reason, in principle, why they may not against the goods of the owner or charterer of the ship. The nature of their service is the same, and if it gives them a jus in re, if it creates a lien which adheres to the thing, it adheres to it, whoever may be the owner. Their own labor has been incorporated into the value of the merchandise in one case as it has in the other. The authorities go directly and fully to the point; the merchandise is declared to be hypothecated for wages, as well as the freight; that is, as I understand the law, hypothecated to the wages to the amount of freight due upon it, and the merchant is not entitled to receive his goods until the lien is discharged.[3] And this leads to an answer to

another difficulty which was stated at the argument. The property has been attached by sundry creditors of the charterers, and the cases are now pending in the state courts. It is argued that, as different creditors are each pursuing their own rights against this property in different courts, it is a proper rule, to prevent collision of judicial authority, to give precedence to those who first lay their hands on the fund. This priority might be decisive if both creditors stood in the same relation to this specific property. But the reason no longer holds when the claim of one of the parties is, in its nature, a privileged claim. The very essence of a privilege is to give the creditor a preference over the general creditors of the debtor; and if such be the claim of the seamen, the attachment only created a lien on the property subject to such prior incumbrance. It can only extend to the whole right of the owner, and that was, to hold the property after discharging the lien. Another argument is, that a bonâ fide alienation defeats a tacit hypothecation, and the purchaser takes the property discharged of the lien. 2 Browne, Civ. Law, 143, is relied upon as sustaining the principle. He says, it is true, that by the civil law, things tacitly pledged might be freely alienated before they were arrested. The general rule of the civil law is certainly the reverse; the purchaser takes them cum onere. Brown refers as authority for this dictum, to the Digest, L. 20, 22, 29, and to Ayliffe's Civil Law. I have not seen Ayliffe, but the law cited in the Digest does not sustain the principle in the terms in which it is stated. The law is confined to a single case, the hypothecation which the landlord has in the movables of his tenant for rent, and merely gives to the tenant the power to manumit his slaves notwithstanding this tacit hypothecation, which he could not do if it was express. But when money is loaned for the repair of a house and the house is sold, it passes cum onere and the hypothecation follows it into the hands of the purchaser; and such would be a case analogous to the present. Another

---

[3] In the case of Sheppard v. Taylor, 5 Pet. [30 U. S.] 675, it was decided that the seamen have a lien or privilege against the freight for their wages, but have no claim against the cargo. In that case, the seamen shipped for a voyage to the north-west coast of America, and thence to Canton, and from thence to the United States. The vessel stopped at Chili, and engaged in an illicit trade, and was seized and condemned by the Spanish authorities. Afterwards, an order of restoration was obtained from the king of Spain, but it remained unexecuted, and the owners filed their claim under the Florida treaty, and it was allowed. The owners of the ship were also owners of the cargo, and therefore no freight was earned eo nom-

ine, but the commissioners awarded distinct sums for the ship, the cargo, and the freight. The court held that there being a restitution of the ship, in value, the proceeds of the ship were substituted for the ship itself, and that the lien re-attached to the proceeds; that freight being the natural fund out of which the wages were to be paid, the seamen had, upon the principles of the maritime law, a claim or privilege against it which might be enforced against the fund in the hands of the assignees, the owners having become bankrupt and assigned their claim for the benefit of their creditors; and ordered, after the proceeds of the ship were exhausted, wages to be subsidiarily paid out of the freight, thus awarded by the commissioners. Pages 710, 711. The question of the right of the seamen to proceed against the cargo for their wages, to the amount of a reasonable freight, where the owners of the ship are the owners of the cargo, again came before the court in the case of Skolfield v. Potter [Case No. 12,925], where the doctrine held in this case is further elucidated and reaffirmed notwithstanding the dictum in Sheppard v. Taylor [supra].

objection urged is the general inconvenience of admitting the principle that the cargo is liable to this process. The inconvenience is, I think, greatly overstated; and in cases like the present it is far from inconvenient, for it enables the seamen to extract their wages from that specific property which actually owes the debt. But in any case, when goods are attached for security, they can readily be discharged by the owners entering into a stipulation. It is the uniform practice of the admiralty to order goods which are so attached to be restored to the claimant on his filing a caution, with sureties, according to the form used by the court. Were it not for this practice, the argument ab inconvenienti would be quite as strong against holding the vessel liable.

Upon the whole, my opinion is, that the freight of that part of the cargo consigned to Mr. Thayer, is bound to the seamen for the payment of their wages to the amount stipulated in the bills of lading; and that they have a lien on that part of the cargo shipped and owned by the charterers, for a charge in the nature of freight, which overreaches the title gained by the assignees under the assignment, and that of the attaching creditors under the attachment. To the amount of a reasonable freight, at least, it appears to me that the seamen stand in the character of privileged creditors of this property, and are entitled to have their claim first satisfied.